Case 14-1046 et al., Carbon Sequestration Council et al., Petitioners v. Environmental Protection Agency and Gina McCarthy, Administrator. Mr. Llewellyn for the Petitioners, Ms. Walter for the Respondents. Mr. Llewellyn, before we start, the Court wants to apologize for imprisoning you in our elevator. But, you know, we do enforce these word limits very strictly here. I'm well aware, Your Honor. I thank you for that. And I can tell you that being stuck in an elevator when I'm due in your courtroom is maybe not my worst nightmare, but it's pretty close. Let me say it's the one excuse we have to honor. Seated with me at council table this morning is Mr. Robert Van Voorhis of the Bryan Cave Firm. May it please the Court, this case involves our nation's efforts to control greenhouse gases, in particular carbon dioxide. Carbon dioxide that is captured before emission to the atmosphere and then injected underground for purposes of long-term storage or sequestration is already subject to extensive regulation under the Safe Drinking Water Act. At issue here is whether that same carbon dioxide is or need be also subject to regulation as a solid waste and potentially a hazardous waste under the Resource Conservation and Recovery Act. EPA's position in this matter has been, to say the least, a moving target. And EPA's shifting positions have resulted in at least two fatal errors. Before we get to the fatal errors, could you start with standing? Could you give us your very best arguments about why the petitioners have standing here? Certainly, Your Honor. You have before you, represented by council, the companies that are going to be implementing this whole program. I will point, in particular, to the Southern Company, which is a member of the Carbon Sequestration Council. The Southern Company is, right now, capturing carbon dioxide and is, right now, injecting it underground for purposes of sequestration. The Southern Company is, in fact, subject to EPA's determination that captured carbon dioxide that is sequestered is a solid waste. In Class 6 wells? I beg your pardon? In Class 6 wells? The Southern Company, no one currently, Your Honor, is using a Class 6 well. That is coming. The Southern Company would like the opportunity in the future to use Class 6 wells and to do so. Well, in looking at the affidavit, there is nothing to suggest that that is indeed the case. There is nothing to indicate that Southern is intending to inject that stream into Class 6 wells for purposes of geologic sequestration. In your submissions, it is your burden to show standing. There is nothing to indicate that that is their intention. Well, Mr. Esposito suggests that... I am talking about the Esposito affidavit. Yes, Your Honor. ...that they are considering, from the Kemper facility, contracting to have some of that carbon dioxide stream sequestered in a Class 6 well. That decision has not been made yet. But EPA's determination here that that is a solid waste will plainly place burdens upon that choice that the Southern Company would like to make free of having to worry about record regulation. What is the burden? As I understand the government's position, if it is injected into a Class 6 well, regardless of whether they call it solid waste or not, there is an exclusion or exemption or conditional exemption. There is an exemption from hazardous waste regulation, Your Honor. Tell us what the injury is. The injury is, first of all, we have to certify. We have to repair, maintain, have available, and so forth, a certification to compliance with the terms of the conditional exemption. That, in and of itself, is a burden. If the court found that carbon dioxide is not a solid waste or if EPA had found it was not a solid waste, we would not even bear that burden. Now, to EPA, that may not be... Would you not want any kind of conditional exemption? Let me back up one step. Have you asked us to reverse or just to vacate their decision? Well, we're asking you to vacate EPA's assertion of RCRA regulatory authority. Then we would be left with just nothing. We would not have a decision that there's no RCRA authority. We would just have no decision at all. Well, I'm not sure that's true, Your Honor. I guess the example I would give you would be what I'll call the API 2 case, 216 Fed Third 50. This was also a RCRA case. The issue there was the agency's assertion of regulatory authority under RCRA over certain oil-bearing wastewaters at petroleum refineries. The upshot of the case was the court found that EPA's rationale was deficient under a state farm analysis. The court vacated EPA's assertion of authority over those wastewaters and specifically said, if the agency wishes to assert authority in the future, it will need to provide a rational basis, a rational explanation for doing so. So I think our view of the case is that if the court grants the relief we're requesting, then we would not be subject to RCRA at all. Can we go back? Depending on the basis, depending on the basis. Depending on the basis, I understand. Right. And you want us to assume that we go most strongly in your direction, and you're entitled to that assumption because it's a standing case. If the court agrees with our Chevron step one argument, then the agency can't go back and redo the thing. If the court says, well, we're not so sure about that, but the agency here is taking a position different than the one it took in the rulemaking, and we're going to vacate for that reason, then the agency could go back and try to do that. So your view under those circumstances would be you're better off without a conditional exemption at all. Is that right? You wouldn't want a conditional exemption of any kind? We don't need a conditional exemption if we're not dealing with a solid waste. So I'm sorry to pursue this just a little bit more. You say you're not challenging the conditional exemption. You're only challenging the finding that the carbon stream is a solid waste, right? Right, which is a necessary predicate for the exemption. Okay. But if you won the first, then you don't want an exemption at all? Is that right? You would never use the ability to have it? We would not need an exemption from hazardous waste regulation because you don't have hazardous waste regulation unless you have a solid waste. So if we don't have a solid waste, we don't have any record regulation at all. What we do have is extensive regulation under the Safe Drinking Water Act, which we're not challenging here. We have no problem with that. I want to go back to the standing. I can't see it in the affidavit anything to suggest that you're contemplating geologic sequestration with respect to Kemper. Looking at the affidavit, I don't see anything there to suggest Class VI wells, geologic sequestration. Where? I don't see it. There's nothing I could find in the affidavit to suggest that you were using or considering using the Class VI wells. There may be something suggesting you might send some other people who might use them, but there's nothing to suggest that Southern is. I'm trying to find it, Your Honor. As was I. I mean, I'll just tell you my concern in looking at this record. I don't see anything with respect to petitioners. The association obviously doesn't have a standing if the underlying petitioner doesn't or the underlying member. I don't see anything with respect to either petitioner indicating that they are using or intend to use Class VI wells and that they will not be affected by the rule. Well, we think they're affected even if they're not using Class VI wells because the Southern Company is currently engaged in the activity that EPA says involves acceleration. Well, that's where I think there's – I mean, EPA can speak to this. I think they're pretty clear in the disclaimers in saying the things that you think are covered, it seems to me they said pretty clearly, are not covered. You're over-reading their rule, and they're pretty clear in what they say about their coverage, and their coverage is Class VI. And you're sweeping much more broadly than they are if I'm reading the record correctly. Well, Your Honor, I don't – I guess we will see what EPA has to say. I don't think you are reading it correctly because I don't – the agency has not argued, and I don't think it reasonably can argue, that its determination that carbon dioxide that is sequestered is a solid waste does not apply to what we are doing in Class V wells. They have not argued – I don't think they reasonably can argue that. Well, we'll hear what they have to say, but you're confirming, at least by failure to state anything to the contrary, that you have not submitted an affidavit indicating that either of your petitioners are or have clear plans on using Class VI wells. I can find nothing. You're pointing me to nothing. And so you're saying your backup position now is it doesn't matter. Class V is good enough. Yes, that's absolutely right, Your Honor. I'm going to try to find that reference. We'll see what EPA says. I didn't hear them saying that, or I didn't read them to say that, but we'll see what they say. Can I just ask a couple more? If I understand correctly, your two injuries are, one, the possibility that you would use a mixed stream, that is a stream that goes some to Class VI and some to Class V, and as a result you would not be able to use the exemption. Is that right? That's one of them, yes. And the other is that you have to file a certificate. Yes. And those are the only two? No, Your Honor. What else do you have? It goes beyond that. The agency, there is no way for us to test to determine whether our waste are hazardous or not. Maybe this goes to what Judge Edwards just said. Assume for the moment that the agency has said, and I think it's clear they have said, that this only applies to streams going to Class VI wells, and that even though you think, and you have a reasonable basis for thinking,  they've said they're not saying it for anything other than VI, and so if you sent it to V, they could not say that was a solid waste until there's some other kind of rulemaking. So you're protected until they make yet another rulemaking. So what is the injury other than the combined stream problem? Well, assuming that what we are managing is a solid waste, is this according to the EPA? It's a solid waste only if it goes into a Class VI well. Class VI. That's all they've said. That's all they've said. I'm just reading it again. They've said it very explicitly. Assume that for a moment. Assume it's only a solid waste if it goes to a Class VI well. Then what other injury do you have other than the two I mentioned, having to file a certificate and what to do in a situation where it's going to two different kinds of wells? If the rule only applies to going to a Class VI well? Yes. Well, Your Honor, I think under a saber technology analysis, our ability, our stated desire to, and I'm going to have to find for Judge Edwards the reference in the record, but as we've argued in our brief, our stated desire and expectation that we would like to use Class VI wells in the future because that's what's going to happen. I mean, this whole program is in the very early stages, Your Honor. Nobody is using a Class VI well right now. I understand. But that's what's going to happen. I'm accepting that argument for the purpose of this part. So that's your argument, that you plan to use or expect to use or close enough to that use a Class VI, and if you did you would have two kinds of injuries, one having to file a certificate and two not knowing what to do with a mixed stream. Well, yes, Your Honor, and even beyond that. Even if we take advantage of the exemption, okay, the exemption does impose a burden, but even if we take advantage of the exemption, we have no protection from liability. If someone downstream does not, we as a generator of the carbon dioxide stream, have no protection if someone downstream makes a mistake, has some kind of minor compliance issue with what they do with the carbon dioxide stream. The EPA said very clearly that the hazardous waste status, the regulated, no longer exempt status, relates back to the generator, and that's the problem. We as generators, in the first instance, have to figure out what's going to happen with this material and how can we protect ourselves. There is no way to protect ourselves because there's no way to test, and the exemption does not provide full protection for violations that may be committed by others. All right. You can go on to the merits, then. Thank you. Right, Your Honor. The two inconsistencies that we see here, and the most important one, Your Honor, is that EPA has abandoned the position that it took in the rulemaking, that the physical form aspect of the definition of solid waste question is governed by Chevron Step 1. Well, that's what I don't see anywhere in the record. I don't see them taking the position that the physical form is compelled, that they must decide that this is a solid waste. Can you point me to where in the record you think supports that proposition? I think the best we've cited a few references. I think the best is probably at Joint Appendix, page 154. I mean, it's at the last paragraph there. EPA was responding to the council's request and argument that what EPA really should do is promulgate an exclusion from the definition of solid waste, not an exemption simply from hazardous waste regulation. And the agency's response was the only way we could do that is if we found that the carbon dioxide is not discarded. The clear implication of that is that there was no way for EPA to say, well, let's see, we have a supercritical fluid. Does that meet the definition of solid waste or not? You said it's a clear implication. That's a lot farther from other cases where we've said the agency says we're not permitted to do this. I mean, I don't exactly see this. If you're looking at JA 154, all they say is they don't agree. They don't agree with your conclusion. That's not the same as saying that they are compelled to reach the decision they've reached. Well, they also say, Your Honor, that the solid waste regulatory exclusion would need to be based upon a finding that CO2 streams sent to a UIC class 6 well for purposes of GS are not being discarded. That's on the definition discarded, right? Right, and that's a separate. That's a separate question, which you are not arguing that they thought they were compelled on. You're only arguing, right, your argument about that they felt compelled is limited. On the physical form. Physical form. That is correct. So I don't even know whether this is an argument about physical form or about discarding. But in any event, all they say is they don't agree. They don't agree with you. Somebody can disagree for more than one reason, one reason being in their discretion they don't agree and one reason being that they are compelled, and this doesn't tell me anything about it. Let's put it this way, Your Honor, and I would also cite JA27, which is the final rule, preamble. Hold on. I have looked. Hold on, hold on. Yes. 27. Yeah, so this one I think really goes completely against you. This is in the middle column where it says, the RCRA definition of solid waste encompasses other discarded material and does not speak to materials such as supercritical fluids, does not speak to is exactly what we say is what leads you to Chevron Step 2. Those are the words we say. When a statute doesn't speak to a particular issue, we say, well, that means we're applying Chevron 2. Why does this make you feel that they think they are stuck at Chevron 1? Well, because the agency never says, there are a couple of ways of looking at this thing. Here's one way, here's the other way, or maybe there are three different ways of looking at this thing, and here's why we are exercising our discretion in the way we are. Here's the weighing and balancing that we're doing of competing interests. We've never said they have to say that. What we've said is you have to avoid saying that you're compelled. But we certainly haven't said that they have to say it's ambiguous in order for us to think that they're exercising discretion. Well, if the agency thought it was ambiguous, which is what they're saying now. You're saying they have to say that. They have to have said below that we think it's ambiguous. Well, they have to give some indication that there is some doubt. Well, they say it does not speak. I don't know what else you would say. Then they go on to say it doesn't matter. What they're saying, Your Honor, is it's not enumerated in the definition. They're saying it's of a similar kind. That's the normal kind of Chevron II analysis. Now, we've said, I'm just going to give you a quote from one of our opinions, which seems to reject the argument you're making here. This is from the Brain Tree Electric Light Department opinion. Petitioners contend that Chevron deference is unwarranted because the commission did not expressly state that the settlement agreement it was interpreting was ambiguous. But the Chevron II step is a dance for the court, not for the commission. We said that it's not enough. You can't get us into a supported only on Chevron I simply by pointing out that the agency didn't expressly say it's ambiguous. Are those the two best that you have? The middle that we just talked about from JA-27 and the bottom of 154? I believe so, Your Honor. I mean, we cite in our brief, I think, another place or two. That's an interpretation of a regulation, the other one. Well, every time the agency responded to comments on this question, the agency said it is what it is. They may have said it is what it is. I'm not sure about that. They didn't actually say those words. In so many words, Your Honor. Okay, go ahead. Additionally, many years ago, the agency adopted the position that the only gases that can be solid waste under RCRA are those that are either containerized, that is placed in individual containers, or if not containerized, that are condensed to liquid form. In contrast, and without explanation, here the agency says that carbon dioxide gas, which is neither containerized nor condensed to liquid form, but instead compressed to a supercritical state, nonetheless is a solid waste. In those cases, they didn't address the semi-state, did they? They did not specifically address supercritical. When they said it has to be condensed to a liquid form, they weren't necessarily excluding it being condensed to the form we're talking about here. Well, Your Honor, they said that the only gases that are subject to regulation as solid waste are those two that I just mentioned. But that was not an issue in any way. No one had said, well, what about this? What about supercritical fluids? No, that is correct, Your Honor. Further questions from the bench? Thank you. Thank you. Good morning, Your Honors. Are you in the elevator, too? I was not, but I would like to say my EPA counsel is the one who did report someone being stuck in the elevator to the security guard. All right, extra credit. I told the opposing counsel they should forfeit just for that. Again, I'm Michelle Walter with the Department of Justice, and my EPA counsel from OGC is Rob Stachowiak. There are maybe five or six points that I would like to- Start with standing. Yes, I will. And I wanted to start actually with Judge Edwards' question concerning his concern that petitioners are over-reading the rule. And in that regard, I'd like to provide the Court with some joint appendix sites that hopefully clarify that and support that petitioners are indeed over-reading the rule here. So let me start with saying that EPA issued this conditional exclusion for a very narrow and circumscribed purpose, which was to remove any barriers specifically for the injection of one form of carbon dioxide, the supercritical form, into one type of well, the class six, for one activity, geologic sequestration. And EPA made very clear in the record, Judge Edwards, that the conditional exclusion was not applying beyond that. So I wanted to point the Court to, first of all, to the joint appendix at 27, column 1. And similar statements are also in the joint appendix on page 165. And there EPA said that in the situation that petitioners seem to be concerned about, if carbon dioxide is used for its intended purpose to be injected into class two wells for enhanced oil recovery, it's EPA's expectation that such injection would not be covered by this type of conditional exclusion that we have here. The class two well is not a class six well. Also, I'd like to point out on... There it says would not generally be a waste management activity. Correct, correct. So that would not be subject to RCRA. The activities that... That it's not what, I'm sorry? The way it's worded, it sounds like an express decision that it would not be a waste management, rather than that we're simply not discussing the point. Correct. I wouldn't say express decision here because, again, we're not dealing with class two, but we're trying to provide the regulated community with assurance that in that type of situation where they're conducting enhanced oil recovery, that's not something that would be covered under RCRA subtitle C. And what does that do for their class five wells? I think those are experimental or something. Correct, those are experimental, and it would be the same situation. Again, we weren't looking at class five wells in this rulemaking, and so EPA would need to make an independent determination in that situation as to what type of activity they were doing for what purpose. What about their argument that you're not protecting them as a generator if someone downstream screws up? Yes, let me find the... There were some citations I wanted to give for that also. First of all, we explain in our brief that the certification only requires the generator to certify the activities that are under their control. So in the situation that Mr. Lowen was discussing where there could be a commingling situation or somebody downstream does something to the waste, those are not, first of all, if it's a commingling situation, that's not something that the conditional exclusion could be used for. They don't seem to be arguing about that. They seem to be arguing about the stream going to two different kinds of wells or somebody later picking up a commingling. Where's the provision that you just mentioned that the generator only has to certify the things under its control? The regulatory provision? Tell me the JA page. That'll be good enough. It's actually... I can give you the actual regulatory language. It's the... regulation itself is in the final rule. On which section? The Joint Appendix, page 36, is the actual regulation. And in the first, going into the second column there, it provides the language for the generator, and then in the second column it provides the language for the owner-operators that they would need to certify to. Right. Just tell me... You're on little sub 2, right? I'm sorry? Little sub 2, 261.4... 261.4H4I. So clear at the bottom of the first column, going up into the top of the second column. Where's the words about the generator? In 4i, it says, any generator of a carbon dioxide stream who claims that a carbon dioxide stream is excluded under this paragraph must sign a certification as follows, and gives the language. I'm just looking for the part that says only the part that I have control over. Uh-huh. That would be... Let me just read through this. And I have transported the carbon dioxide stream in compliance with or have contracted with a pipeline operator or transporter to transport the carbon dioxide stream in compliance with the following regulations. And what EPA explained in the rulemaking is that in response to comments on the proposal, that industry was concerned that they might have to certify to activities beyond their control. EPA said... I'm sorry. That is... One moment, Your Honor. Oh, thank you. Joint Appendix, page 29. And that is in the second column, about midway down. There's a paragraph that begins, EPA is making these revisions to better reflect... Actions over which each party has control. Yes. Does that answer your question, Your Honor? Well, is there another line that says generators who don't have control don't have to worry? Not that if they don't have control they don't have to worry, but here, if a generator is not sure if their activity is going to fall under the conditional exclusion, they don't have to use the conditional exclusion. If they want to use it, they only have... But their argument is that if it's solid waste, now that you've decided it's solid waste, and if they don't use the exclusion, they will be in trouble. They will have to go to extreme efforts to determine that there's no hazardous waste, right? That's their injury claim. Which the facts of that injury claim are not correct, because, again, as the Court has pointed out, they haven't shown that they're actually going to be using these Class VI wells. But if you look also at the declarations, they don't claim that their injury is from having to sign the certification itself. All the declaration, and I believe it's Mr. Esposito's declaration, says is that they are concerned about activities down the pipeline, and those types of activities would be out of their control, so they wouldn't sign the certification in the first instance, and even if they did sign it and something happened down the pipeline, if you look in the Joint Appendix at page 152, EPA addressed the situation where something might happen... I don't know if it was this specific situation, but, for example, if something might happen down the pipeline that the supercritical stream is mixed with the hazardous stream, so the conditional exclusion would be lost, EPA addressed Mr. Llewellyn's enforcement concern. And there EPA said they can appreciate the commenter's concern over the loss of the conditional exclusion due to the action of subsequent handlers of the CO2 stream. EPA's Office of Enforcement and Compliance Assurance is unable to provide definitive assurances outside the context of a formal enforcement proceeding that the government will not proceed with an enforcement response to a specific individual violation. It goes on, and then it says, however, EPA can, and has previously done so for other RCRA rules, exercise discretion to decide when and how to respond or not to respond to a given violation based on the agency's... Not much comfort. It's as much comfort as the government can obviously give without having a factual context. It's a different issue, so now we're not talking about whether the government's doing the right thing or the wrong thing, we're just discussing a standing question. And I thought you were going to tell me that EPA's position is that if the generator certifies and then something out of its control screws up, I thought you were going to say, well, that's no problem. EPA has agreed it's out of your control, so you're okay. But actually what you're telling me is it's out of your control, and now it's within our control and it's our discretion, and that's not the solution. It's not the same thing at all. You're right, it's not the same thing, but EPA did as much as they could do in this situation, looking forward to a hypothetical situation like that, to try to provide industry as much assurance as they could that they would look at several factors, and if somebody signed a certification in good faith to the activities that they could control and something happens downstream out of their control, that may remove the conditional exclusion, but doesn't necessarily mean that EPA is going to decide in that particular factual context to initiate an enforcement action, and that's purely speculative. They would surely be better off in those circumstances if this carbon stream were not a solid waste, right? Under those circumstances, you would have no discretion. I lost you on the last part of that. If, for example, we were to hold you wrong on the merits, which we assume for purposes of standing, then under those circumstances, they would be better off because then enforcement would not be in the EPA's discretion. It would be barred, correct? In that situation, yes, but again, their declarations... But the answer would be they're not proposing to use Class 6 wells. Exactly, their declarations... They're no better or worse off. They're not covered. Right, their declarations don't support that specific type of injury. They're in this class. I'm looking at it again. They're just not making that assertion, and the best counsel has said is that, well, but we might think about it. But I don't know that that can support standing. We might think about it, and anybody can think about anything, anytime. Correct. I'm just trying to disentangle the two arguments. So if you assume for the moment they had said, tomorrow we're going to start with Class 6 wells, then you agree there is a potential injury that could be rectified by the court? Not based on these declarations. Again, their declarations haven't specifically said that. Assuming the declaration said, we are going to start Class 6 wells tomorrow, then there could be a problem here, right? If the declaration then also went on to say, we are burdened by simply having to sign this declaration, and as the declaration then says, we think there could be situations where the waste stream might get commingled downstream. But again, that's purely speculative. You're establishing a rule for Class 6 wells, right? I'm sorry? EPA has established a rule to govern Class 6 wells. That's what this is all about, right, Class 6 wells? The prior Class 6 rulemaking under the Safe Drinking Water Act. And you're saying there's no one has yet started using Class 6 wells, is that right? Correct. And now you're working on a conditional exemption for Class 6 wells, right? Right, because there are some that are in the process of being constructed or potentially permitted, so we want to facilitate that. But none who are members of these entities, is that what you're saying? Correct. So these people could challenge this as soon as they indicate that they are going to start trying Class 6 wells. Is that right? I question whether they would be out of time at that point. Well, it can't be that they don't have standing now because they haven't done it yet, and then don't have it standing later because they waited too long. That can't be, can it? Is that your position? No, no, it's not. I was just thinking procedurally whether they would actually be able to. But again, they would have to make sure that they met their burden of providing the precise facts to show what their injury is. Isn't the idea of having a conditional exemption that you're trying to encourage people to do this, and particularly people who haven't done it yet? So wouldn't this be the right time to be, that is before you've started, to know what the situation is? And to challenge the rule if you think that the rule is incorrect? Yeah, I don't think we've said that this isn't the right time for them. What we are struggling with trying to understand is what their real injury is, especially when you take a step back and look at the fact that, again, EPA was removing the barriers of the RCRA Subtitle C regulations, and they were trying to make this simpler for industry so that these types of carbon sequestration activities can get off the ground without industry having to worry about complying with Subtitle C. And the fact that this conditional exclusion, and we mentioned this in our brief, EPA analyzed could save industry each year close to $5 million to over $7 million. So the fact that they haven't tackled the cost savings of this, they also haven't said that just the certification itself, just signing the certification itself is a burden, and instead they're relying on purely speculative situations that have not happened, that were not before the agency, and that's not sufficient. Is it necessary for the agency to find that this supercritical fluid is a solid waste before it could actually have an exemption or a conditional fluid? In other words, the agency has made that finding, that this is a solid waste that would be regulatable under RCRA. In this particular circumstance, not as a general matter. So the solid waste finding that EPA made, which, yes, they have to make as a predicate to issuing a conditional exclusion, that solid waste finding only applies to supercritical, injected into a classics well for geological sequestration. It does not apply to any other wells, to any other forms, or any other types of activities. So going back to the- My understanding of that is in part, if I understand the agency correctly, part of the rationale is that in these other circumstances you don't consider it discarded because it isn't clear whether it will be, in fact, discarded or otherwise used. Correct. I mean, that's the agency's thinking, and so the class six in the agency's mind makes sense. That's all we're doing is saying class six, because we know for sure that's discarded, so the definitions are all met. They are over-reading the rule, at least the way the brief, the regulation, and your assertions now say. They want it, and I think it's because they otherwise have serious standing problems. They're over-reading the rule to be included, but they're not otherwise folks who are interested in class six, then they don't assert it. Right. I just can't find it. Can I ask, how will it be possible, if you rule now that it's, and you have, that this is solid, how will it be possible to argue that in a class five or a class two well it's not solid? I get the part about the discarded, but what about the solid? Let me give you a couple of joint appendix sites that explain that and try to explain it to the best of my layman's understanding. In different well situations and different carbon dioxide forms, whether those forms and that situation can support a determination that it's discarded and thus solid waste is going to depend on a number of factors, including what the constituents were in the carbon dioxide that was released, what type of capture technology was used, what type of facility was emitting the substance. All of those technical determinations are factored in, in addition to what is the purpose of the activity. So when you're looking at another well like class two or class five, EPA would have to look at is that activity intended to abandon, dispose, discard? I understand that. I'm asking to exclude that argument for the moment. I'm only asking to think about why is supercritical carbon dioxide in class six different as a matter of physical form from supercritical carbon dioxide in class two? I don't know that the supercritical form is different, but that's where you get into what I was mentioning about the activity being different. So if the activity is for enhanced oil recovery, that's not an activity that's intended for abandonment or discarding. I know. So what they're saying is any decision you make now about whether it's solid is something that's going to hold with respect to other classes. Now, there will still be an argument that it's not discarded, but the first argument that it's solid will have been decided. No, Your Honor, because the determination as to whether it's discarded is part of determining whether it's a solid waste. This is the part I'm not understanding. Why does the use to which it's going to be put make any difference as to whether it's solid or not? If you look at the definition of solid waste, which is in 42 U.S.C. 6903, paragraph 27. So I'll kind of go through the definition here. It says means any garbage, refuge, sludge, et cetera, from a waste treatment plant, et cetera, or other discarded material including solid, liquid, semi-solid. In looking at that definition, the court in the AMC 1 decision said that when you're looking at other discarded material, you look at the plain meaning, and that means abandoned, disposed of. So that's why in order to determine if something is a solid waste, EPA has to look at is the activity, abandoning, disposing, et cetera, of that particular material. Yeah. I think I understand all that, but I don't think you're sort of accepting the parameters of my question. So my question is they've made two arguments here. One is that it's not really discarded, right, and the other is that it's not really solid, right, or liquid, or semi-solid. It's something else altogether and, therefore, can't be included. It's not an included. Whether it's discarded or not, it couldn't be included. I see. So you're referring to ñ I misunderstood when you said solid. I thought you were referring to the solid waste. You're referring to the including phrase that has those other forms. I apologize for my understanding. EPA did not need to conclude or look at whether these were contained or uncontained gases. And the supercritical form, and, again, let me point you to some places in the record that explain what the supercritical form is. It's something that has the properties of a liquid and a gas. I got it. I took physics. I actually got that point. You get it more than I do. See, the question I'm asking is, seemingly what they're complaining about is that at least part of what you're deciding here necessarily has to bleed over into decisions about other kinds of wells. Now, of course you can say, and you have, that this only applies to Class VI, so we're going to have to start over again with Class II. So even if we're going to come to the same place, it's only by precedent, and that's not enough for standing. I understand that. But I'm just wondering how it would be possible to say that a supercritical in a Class II well is solid, liquid, semi-solid, or contained gaseous, something like that. How you could say it is not in a Class II well but is in a Class VI well? You're correct. I think that although EPA hasn't looked specifically at that situation, the supercritical form, if it's the same, it would be the same in a Class II versus a Class VI. But you still then have to get to the other part of the solid waste determination, which is whether that is actually discarded. Whether it's reusable in some form. Correct. And if it's not, then it's not going to be the same in a Class II well as it is in a Class VI. If it turns on being discarded, then does just the mere fact of geological sequestration mean that it's permanently discarded? I thought I understood Mr. Llewellyn to be saying that it could be removed from even a Class IV well and reused. So is the agency saying that once discarded in this Class VI well, it cannot be reused? Not that it can't be reused. EPA did say it could be. There's nothing in the conditional exclusion that precludes the carbon dioxide from later being withdrawn. But that isn't relevant to whether it's discarded in the first instance because the entire purpose of geological sequestration is to isolate something, at least permanently if not semi-permanently. And the Esposito Declaration in Petitioner's briefing even acknowledges that in paragraph six. It says geologic sequestration is to isolate the carbon dioxide permanently from the atmosphere. And these Class VI wells, where this carbon dioxide is injected, goes up to half a mile below the Earth's surface. It's intended to prevent these emissions from reaching an underground source of drinking water. So the fact that that is the epitome of abandonment, that's why EPA very clearly in the record kept saying that these types of wastes in these types of wells, excuse me, these types of streams in these types of wells, are in fact discarded because they are abandoned. And the fact that they could potentially be withdrawn, which again there weren't any facts during the rulemaking to actually support that, isn't relevant to that determination of whether it's discarded in the first instance. And I believe that the AMC 2 court and the API court rejected the argument that potential reuse or beneficial reuse would prevent a material from being classified as discarded. Any questions? No questions. Thank you. Thank you, Your Honor. We'd ask that the petition be dismissed, of course. Thank you. Any time left? All right.  but just to discuss the standing issue again that's been raised. I appreciate your indulgence, Your Honor. So they say two things. One is, as Judge Edwards was asking, that there didn't seem to be a place in Mr. Esposito's declaration where he talked about any kind of plan to use Class VI, and now the government points out there doesn't seem to be any place where they, where Mr. Esposito mentions any harm from merely having to certify. So if you could address both of those, that would be helpful. Well, on page 10 of Mr. Esposito's declaration, I guess it's the last sentence, it says that SES Southern will be injured by being put in a position of not being able to comply with the certification requirement of the final rule if it decides to contract for the geological sequestration by a third-party recipient of some of the supercritical carbon dioxide sent from the Kemper County Energy Facility through the commingled pipeline. It does not specifically say Class VI. But that's, in the future, that's what it's going to be. Right now it's only demonstration. You mean a third-party might be subject to the regulation? Is that what you're saying? Well, I'm saying that in the future... Is that what Esposito was saying, that a third-party might, if they contract with a third-party, they might be subject to the regulation? Well, they would be as well as Southern. I mean, because Southern is the generator. Right. And as the generator, the generator has responsibilities that attach from the point of generation through management or through sequestration. What I'm saying is, I'm sorry that I'm sounding ignorant here, but I'm not understanding what the asserted injury is with respect to this connection to a third-party contractor. In other words, what is Esposito suggesting is the injury? What he's suggesting, Your Honor, is, look, this is what we would like to have the opportunity to do free of record regulation. And if we do decide to do this, we will not, if we send it to a commingled pipeline where there is gas going, CO2 going to various types of wells, we will not be able to take advantage of the exemption because we cannot certify as to exactly where our CO2 went because it goes into a commingled pipeline. So now, as Southern Company is in a position of saying, well, we can't go that route, so we need to figure out if we're managing a hazardous waste or not, so we have to test, but there's no way for us to test. And if we do test and it turns out that it's hazardous and we send it to, first of all, we can't take advantage of the exemption, but even if we could take advantage of the exemption, we're not protected from violations that may occur downstream. I note that EPA has not identified any difference whatsoever between either the discard issue or the form issue between sequestration in a Class 5 well and sequestration in a Class 6 well. But putting that issue aside, in the future, what are we going to use? What is Southern Company, if they're going to do sequestration, is going to be in a Class 6 well? We are very concerned about the effects of 42 U.S. Code section 6976A. If we can't challenge this now, we may very well not be able to challenge it in the future because of 6976A1 statute of limitations. I know that the Court has generally relied on that in ripeness cases, but it really ought to be a factor in the Court's deliberations here on the standing question as well, it seems to me. Is there a ripeness question? I don't believe there is, Your Honor. Maybe the question is whether this is ripe in a situation where you're not indicating yet any interest in doing this. I'm looking for this as a way to protect you from the statute of limitations problem. Is there an argument it's not ripe? I don't believe there's a ripeness problem here, Your Honor. I see. We only have to show that there is a substantial likelihood, a substantial probability, that EPA's action created a demonstrable risk of injury to our particularized interest. I think we've done that here. We are the folks that are capturing this material. We would like the opportunity to use Class 6 wells free of record regulation. That means that EPA also has shaped the competitive environment in which we're operating, and I'll rely on the Sabre, Inc. v. DOT case for the proposition that to the extent the rule shapes the competitive environment and will affect our business decisions in the future, we've shown standing. There is also an opportunity injury that the Court has recently recognized in Sierra Club v. EPA, 755 Fed Third 968 at 975-76. That involved a case where the association could not identify specific refineries that were taking advantage of an exclusion at that particular time but had expressed a very definite interest in wanting to be able to do so in the future, and the Court found that the interveners had standing on the basis of a so-called opportunity injury. I think we're talking about a very similar thing here. May I have one moment on the merits, Your Honor? Yes, go ahead. Actually, still on standing. Well, then I have a question about standing. All right. So it seems to me I have a better place than the government pointed to with respect to its argument about generators. In the final rule that will register notice of JA-26, it says under the final rule, the certification statement that the generator would sign is specific to the activities within the generator's control. Right. That sounds like you're protected with respect to things outside your control. That's only as to what we are certifying as to what is under our control. Your Honor, you also need to look at JA-29, 79 Fed Reg 357, JA-29. Here's what the agency said. A violation of a condition, condition of the exemption, at any point in the management of a CO2 stream that is otherwise hazardous would result in that CO2 stream being subject to all applicable Subtitle C regulatory requirements from the point of generation. So it's fine that we only have to certify to our compliance with certain things, but we are still liable for violations that may occur downstream from us because if someone doesn't cross a T or dot an I downstream from us, then we have been managing a hazardous waste from the point of generation, and we as the generators are on the hook in a world of hurt. Very briefly, may I, Your Honor? Well, let me just ask whether anybody on the Court has a question about the merits. In that case, I'll let you sit down. Thank you very much. Thank you, Your Honor. All right. We'll take the matter under submission. Thank you both. Thank you. Thank you.
judges: Garland, Brown, Edwards